## HERTZEL *et al*. v. WEBER *et al*.

No. 2239.   Opinion Filed November 14, 1911.

(120 Pac. 589.)

1. **STIPULATIONS—Appointment of Commissioner to Take Proof.** In a suit in equity pending in one of the United States courts of the Indian Territory upon the admission of the territory as a state which prior to trial was transferred to the proper state court under the terms of the Enabling Act and the Schedule to the Constitution, it was proper for all the parties to stipulate and for the court to direct that a commissioner shall be appointed with power only to take the proof in said cause and report the same to the court.

2. **APPEAL AND ERROR — Review — Findings of Commissioner.** When, in pursuance to such stipulation and order, all the evidence is taken and reported to the court after all the parties have formally closed their case, it is entitled to the same weight as evidence taken before a master in chancery by consent, and on appeal findings of the court based thereon must be treated by the appellate court as so far correct and binding as not to be disturbed, unless it appears with reasonable clearness they are in conflict with the weight of the evidence.

3. **SAME—Amendment of Pleadings—Review—Discretion of Court.** After said cause is closed, as stated above, and comes on to be heard before the court upon the evidence taken before the commissioner, leave to amend pleadings and introduce further evidence is within the sound discretion of the trial court, and its action thereon is not ground for reversal, unless it clearly appears that the court abused its discretion.

4. **SAME—Review—Harmless Error.** The court in every stage of action must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect.

(Syllabus by the Court.)

*Error from District Court, Washington County;*
*T. L. Brown, Judge.*

Bill by Oliver Bagby against Freeman E. Hertzel, Howard Weber and others. From the decree, Hertzel and Theodore N. Barnsdall bring error. Affirmed.

*Flynn, Ames & Chambers,* for plaintiff in error Hertzel.

*Veasey & Rowland* and *J. D. Talbott,* for plaintiff in error Barnsdall.

*Wm. J. Breene* and *Burdette Blue,* for defendant in error Weber.

KANE, J. This suit in equity was instituted by Oliver Bagby on the 27th day of August, 1907, for the purpose of determining the interest of the defendants Freeman E. Hertzel, Theodore N. Barnsdall, and Howard Weber to and in certain trust fund moneys which accrued from the operation of two oil leases and came into his hands as an officer of the Vinita & Chelsea Oil Company. The controversy is entirely between Hertzel and Barnsdall on one side and Weber on the other. There is no controversy over the amount of the fund held by Bagby, the manner it came into his hands, or the validity of the oil leases or the title to the oil lands from which the fund arose, and these collateral matters will only be noticed in this opinion in so far as they are necessary to make the points involved clear. In due time Weber intervened, and, without denial of the material allegations contained in the complaint, asserted in his own right exclusive title to said funds, and prayed a decree to that effect, and Barnsdall and Hertzel jointly answered "that the money in question has been derived from the sale of oil produced from the leases mentioned in the complaint filed herein, and that these defendants, Theodore N. Barnsdall and Freeman E. Hertzel, produced the same, and are entitled to all the money in the hands of the above plaintiff, and they pray judgment of the court to that effect." The oil company answered as follows:

"The Vinita & Chelsea Oil Company says: That the money in the hands of the plaitiff Oliver Bagby has been derived in part from the operation of an oil lease executed by Etta Mode to the Vinita & Chelsea Oil Company, and that the same represents three-quarters of the oil produced on the lease after deducting operating expenses; that the Vinita & Chelsea Oil Company is in doubt as to whom to pay the three-quarters of the oil produced, and it says that it is willing to abide the decision of the court in this case upon the question; that it is advised that Howard Weber claims that he is entitled thereto, and it is advised that T. N. Barnsdall and Freeman E. Hertzel claim that they are entitled thereto, and therefore it asks the court to have these parties litigate their rights in this case, so that it may know to whom to pay the three-quarters of the oil produced."

After the issues were joined, the parties stipulated that a commissioner be appointed, with power only to take the proof and report the same, whereupon the court appointed Mr. Montgomery commissioner, and directed him to take the proof in said case at any points within the state that were most convenient to the parties, and report the same to the court at the beginning of the next term, unless by consent of all parties the time should be enlarged. The cause was tried to the court upon the evidence returned by the commissioner, after which the court made very full findings of fact and conclusions of law in favor of Mr. Weber, upon which it entered a decree, to reverse which this proceeding in error was commenced.

Counsel for plaintiff in error in their brief present their assignments of error under the following heads: (1) The court erred in refusing to allow the plaintiffs in error to file their amended answer and cross-petition. (2) The court erred in refusing to consider the exceptions of plaintiffs in error to the depositions of defendants in error before the trial of the cause. (3) The court erred in admitting evidence over the objections of plaintiffs in error. (4) The court erred in rejecting evidence offered by the plaintiffs. (5) The court erred in refusing the request of the plaintiffs in error for their findings of fact. (6) The court erred in making his findings of fact. (7) The court erred in its conclusions of law and refusing the conclusions of law requested by the plaintiffs in error. We will notice

these assignments in the following order: 6 and 7, 1, 2, 3, 4, and 5.

The only findings of fact complained of are the eighteenth, twentieth, and twenty-first. All of these findings, except the twenty-first, seem to refer to collateral matters, and could be omitted without impairing Weber's right to recover upon the remaining findings of fact, if they are supported by sufficient evidence. The twenty-first finding may become important in connection with a phase of the case which will develop later, and we will then notice it more fully.

Mr. Weber's claim is based upon an oral contract, concerning which he testified as follows:

"A. Mr. Hertzel had been requesting me to make a proposition for the sale of the Mode and Moore land. I had declined to make any proposition. He came down to the house at this time, and, after a little preliminary conversation, I made him this proposition: I will sell you two-thirds interest in the Mode and Moore for $5,000 and a well drilled free of cost to me on each lease, the title to vest when the $5,000 is paid and the well completed on each lease. As soon as—but Mr. Hertzel suggested the leases were not approved, and, as soon as the leases were approved, I was to attach a draft to the contract, and send it to Mr. Hertzel, and he would pay the draft. Q. When were the leases on the Mode and Moore approved? A. The lease on the Mode was approved late in January. The lease on the Moore was approved along about the 1st of March, 1906. Q. When, if at all, did you next hear from him in that matter? A. Along the latter part of November. Not having heard from him, I wrote or telegraphed him. Q. What was done? A. I received a message on Novemmer 30th, I think, signed Hertzel and Barnsdall from Chicago. The telegram is already in evidence." (It reads: "We accept your proposition on the 125 acres.") "Q. What was the next thing done, if anything? A. I wrote to the Vinita & Chelsea people as per letter offered in evidence, and told them to make the contract out in the joint names of myself, Barnsdall, and Hertzel." (The letter referred to reads: "Received your wire upon my arrival at Pittsburg Wednesday morning but found Mr. Barnsdall in New York. Met him in Chicago Thursday morning and wired you that we would accept your proposition. Please rush the approval of the leases and draw on me here with papers attached.") "Q. What

next was done, if anything? A. Previous to the receipt of the telegram of November 30th, I had taken possession of the property and moved a lot of stuff on and incurred a lot of expense in a preliminary way to operate the property for myself. Q. Was that with the knowledge of the Vinita & Chelsea? A. Yes, sir; and continued these operations, and even before the lease was approved I drilled in the well and proceeded to develop and protect the property. I had material on the property before I saw Mr. Hertzel. Q. Did they have anything to do with it, directly or indirectly? A. They had nothing to do with it, directly or indirectly. Q. Having made this conditional arrangement and taken possession of the property, having begun developments, and operations, what then took place with reference to the Hertzel proposition, so called? A. In January Mr. Hertzel came out again, and, well, I received the contracts written up as requested in the letter to the Vinita & Chelsea people which I forwarded to Mr. Hertzel, requesting him in the letter to execute the same and forward them to Mr. Barnsdall, and return to me and I would execute them, forward them to the secretary, so that the contract would be ready to attach the $5,000 when the lease was approved so there would be no delay in that respect. Q. What, if anything, occurred? A. The contract was never returned, and the leases after the Mode lease was approved. I got copies of the contracts that were made, and attached draft for $5,000 to them, and sent them to Mr. Hertzel. The draft went to protest, and the contracts were returned. A little later I attached another draft. At this time I simply made a draft on them. I got a copy of the contracts and attached a draft to them, and that draft and the contracts were returned. * * * A. During the visit in January an arrangement was made by my suggestion without prejudice to any rights that I might have in the contract, that until such time as the original proposition could be carried out that all moneys from the sales of oil should be sent to Mr. Hertzel, and, if they were insufficient to meet the current bills, he should advance until such a time as the original proposition could be carried out sufficient moneys to pay any excess of expenditures and under that arrangement—Q. Was that arrangement communicated to Mr. Barnsdall? A. I couldn't say. Q. Under that arrangement, what was done? A. Under that arrangement, I directed the Vinita & Chelsea people to send the receipts from the sale of oil to Mr. Hertzel, and I sent the bills for the development and operating the property to Mr. Hertzel, and they were paid by the personal check of F. E. Hertzel. Q. How long did

that conditional arrangement continue, as near as you can remember? A. That conditional arangement continued until the refusal to pay the last draft in March, when I notified Hertzel that on account of his failure to carry out the original proposition that I would operate my own properties. Q. Now, at the time of such notification by you, what did the properties under the conditional arrangement owe Mr. Hertzel or Barnsdall, or either of them? A. The property under the arrangement probably owed them from $10,000 to $15,000; that is, under the conditional arrangement. Q. Under your agreement or arrangement with Mr. Hertzel relative to the Mode and Moore when was the $5,000 to be paid? A. Immediately after the approval of the Mode and Moore leases, and as soon as the contract could be made and sent. Q. What contract do you refer to that was to be sent? Do you mean contract signed by all the parties before it was sent? A. No; just the form of contract from the Vinita & Chelsea people to me or to us. Q. Now what forms, if any, do you refer to that were to be attached to the draft drawn on Hertzel? A. They having already the forms of contract as agreed upon, when I sent the draft, I sent the draft alone, without any contracts attached. That draft was protested. I then got a copy of the original form from the Vinita & Chelsea people, and attached a second draft, and sent it to Hertzel. The draft and contract were returned. It was sent 'no protest,' so it was returned unpaid, and the contracts were returned with it. Q. What do you say as to whether or not these forms were in accordance with the understanding and agreement between yourself and Hertzel? A. They were in conformity with it and identical with the ones first sent. They were verbatim."

The greater portion of this evidence was not disputed in any way, and, where there was a conflict, the preponderance seems to be on the side of Mr. Weber, and, of course, this court would not be justified in setting aside the findings of the court in his favor, unless they are in conflict with the weight of the evidence.

Discussing the seventh assignment of error, counsel for plaintiffs in error says:

"The fundamental error in the conclusions of law grows out of the palpable error in the findings of fact by which the payment of the $5,000 gradually developed from a mere agreement to pay to a condition precedent to the vesting of title.

The payment of the $5,000 was either a condition precedent or it was not a condition precedent. If it was not a condition precedent, the decision of the court is manifestly wrong, regardless of the questions discussed. If it was a condition precedent, Weber is not in position to assert it, for three reasons: (a) He had not complied with the agreement when he drew the draft, because the drilling contracts had not been executed. (b) He waived it by subsequent proceedings under the terms of the contract. (c) He is estopped by his subsequent conduct from asserting the condition."

The court found that the payment of the $5,000 was a condition precedent, and, as there was ample evidence upon which to predicate this conclusion, this court is precluded from further inquiry into that question. We must therefore treat the payment of the $5,000 as a condition precedent, and discuss the remaining propositions of law that grow out of this assignment from that standpoint. In the discussion of the question arising under subtitle "a," *supra,* counsel say:

"It is the undisputed evidence that the contract was never executed by Bagby and the Vinita Company, nor was it ever executed by Weber himself. Therefore there was no 'contract,' and Weber was not authorized to draw until he had a contract. But even this unexecuted instrument was not attached to the drafts as required by the agreement. Nothing was attached to the first draft, and only a copy of this incomplete, unexecuted and unacknowledged writing was attached to the second. * * * Therefore, not having complied with the contract himself, he is not in position to invoke the aid of a court of equity in seeking a forfeiture as against Hertzel."

We think there was sufficient evidence to sustain the finding of the court below on that question in favor of Mr. Weber. There is another ground, however, for denying Hertzel and Barnsdall the benefit of this contention. Mr. Hertzel testified as follows:

"Q. Mr. Hertzel, did you and Mr. Barnsdall ever pay the $5,000 which was agreed to be paid in regard to the Josie Moore and Etta Mode leases? A. No, sir. Q. Will you explain why it was not paid? A. Mr. Barnsdall claimed those leases belonged to him. Q. I wish you would state into the record the exact objection which Mr. Barnsdall had towards paying the $5,000. A. Well, Mr. Barnsdall claimed those leases should

have been made out to him, and consequently Mr. Weber would not be entitled to receive any money for them."

The principle applicable to the foregoing facts is illustrated by *St. L. & S. F. R. Co. v. Copeland,* 23 Okla. 837, 102 Pac. 104. In that case the railway company contended that they were entitled to the benefit of a condition in a shipping contract which required the shipper to request in writing the railway company's agents to unload, feed, and water its cattle in transit, if the same became necessary. The evidence showed that the shipper orally requested the carrier to unload the stock and the conductor in charge of the train refused to do so, upon the ground that the freight had not been paid. It was held:

"Where a contract for the carriage of live stock provides that the carrier shall stop its train at any of its stations for water and feed where it has facilities for so doing, whenever requested in writing by the owner of said live stock or the attendant in charge thereof, the refusal of the agents of the carrier to unload such live stock on the oral request of the owner, basing such refusal upon the ground that the freight thereon had not been paid, waived a strict compliance with the clause of the contract requiring the request to be made in writing."

This principle is well supported by the authorities and we think it applies to the case at bar.

The second phase of this assignment invokes the doctrine of estoppel against Weber's right to a rescission of the conditional contract. The evidence shows that about the time the parties entered into the contract heretofore under discussion Weber and Hertzel entered into what the court below calls a "temporary arrangement," whereby Weber was to keep an account of the expenses incident to the development of the property embraced in these oil leases, and draw upon Hertzel for the payment thereof. Under this agreement, the proceeds derived from sales of oil produced were to be forwarded to Hertzel at Warren, Pa., until Hertzel was fully paid for the expenditures thus made by him. This arrangement continued for a considerable time after the protest of the $5,000 drafts and after Weber had notified Hertzel of the rescission of the contract of sale, during which time Hertzel honored vouchers

for expenses duly O. K.'d by Weber and furnished large sums of money, all of which had been repaid, except a small unliquidated balance, at the time the oil company ceased to forward the proceeds of the sales. Excerpts from Mr. Weber's evidence in relation to this arrangement are set out elsewhere in this opinon, and disclose his contentions in relation thereto. Mr. Hertzel contends that this latter arrangement was part and parcel of the original contract, all of which was based upon the same consideration, and that Mr. Weber, by reporting to him and receiving large sums of money from him after his pretended rescission of the original contract, is estopped from denying his liability thereon. The court below found (finding 21 heretofore referred to) :

"That under the temporary arrangement of January, 1906, as already indicated in requisition eighteen hereof, the understanding and agreement of said Weber and Hertzel was that merely for convenience the interim accounts were to be opened and kept in the name of Hertzel, but that the bills were to be paid by individual checks of said Hertzel, and that the oil sales received by him individually were to be without prejudice to Weber's rights in the premises, and that these were the only methods and intent of said parties under which said interim operations were conducted prior to the 7th day of April, 1906; that Barnsdall was not a party to this temporary arrangement, and repudiated the same; that after April 6, 1906, the said Vinita & Chelsea Company and said Oliver Bagby promptly notified that Weber had abrogated the said conditional contract, and offered to take over said properties himself; that they notified said Hertzel of Weber's said claim and offer to Barnsdall's knowledge; that thereupon all parties interested, except said Barnsdall, acquiesced in an agreement without prejudice to the legal rights of Weber under said conditional contract, whereby the oil proceeds were to be paid to Freeman E. Hertzel individually, but said Weber was to have and retain continuous possession and control of said property for operation and development; that the necessary bills to be O. K.'d by Weber and paid by the individual check of said Hertzel, and that such were the exclusive methods prescribed in the intent with which the said operations were conducted after April 6, 1906, and this to the knowledge and consent of Oliver Bagby and the Vinita & Chelsea Oil Company."

This finding is severely criticised by counsel for plaintiffs in error; but, as there is evidence reasonably tending to support it, we are not at liberty to disregard it. The facts found justify the conclusion reached by the court. Moreover, neither Hertzel nor Barnsdall pleaded an estoppel, but thus far we have discussed the case as if they had, for the reason that that question has not been raised by counsel, and the court below treated the case as though that was an issue joined by the pleadings. The court below found upon sufficient evidence that Weber intended to rescind and did promptly rescind the conditional contract of purchase after April 6, 1906; that thereafter he did no voluntary act in recognition thereof; that the *ad interim* or tentative arrangement for development advancements was between Hertzel and Weber, and was subsidiary to the contract of purchase, and in no way impaired it; that Barnsdall never was a party to such arrangement for advancements or incurred any liability respecting it and at all times repudiated the same; that Weber upon rescission promptly claimed the entire property and offered to settle with Hertzel; that the tentative arrangements for advancements by Hertzel was personal between him and Weber, and in no way controlled Weber's right to rescind or afforded a basis for an estoppel after April 6, 1906; that it was a mere collateral matter not affecting all the parties to the issue, and therefore determinable upon accounting between the parties thereto without dependence one way or the other upon the controlling question involved herein, which is one of title between Weber on the one hand and Hertzel and Barnsdall on the other. These findings certainly justify the conclusion reached by the court below, and they cannot be disturbed unless it appears that the rights of Hertzel or Barnsdall were prejudiced by some of the remaining assignments of error.

Section 5680, Comp. Laws 1909, provides:

"The court, in every stage of action, must disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

The application of this statutory requirement is illustrated by *Mullen v. Thaxton,* 24 Okla. 643. 104 Pac. 359, where it was held that:

"The improper admission or rejection of evidence, if not prejudicial to the party complaining, is not ground for reversal."

That rule must be kept in mind in discussing the remaining assignments, as they all relate to errors or defects in pleadings or proceedings. The application to amend the pleadings was made to the court long after the taking of evidence had been closed by the commissioner with the consent of all the parties. Accompanying the application for leave to amend was a showing to the effect that the original answer of Hertzel and Barnsdall set up a claim to the entire fund, whereas Hertzel had never intended to claim more than one-third of same, and that, whilst Barnsdall was always of the opinion that he was entitled to the entire fund, he was willing at the time the application to amend was made to take one-third, basing his right thereto upon the same ground put forward by Hertzel. The court entered an order permitting the parties to amend their pleadings to conform with the proof, but refused to permit Hertzel and Barnsdall to amend by setting up their new defenses, on the ground that, by the stipulation of counsel, the evidence was to be taken before a commissioner, and in pursuance to that stipulation the case had been closed, and that the new matter contained in the amended pleadings substantially changed the original defense. Weber availed himself of the leave granted to amend to make the pleadings conform to the proof. Hertzel and Barnsdall declined to plead further.

It is true that our statutes governing amendments are very liberal, and the courts ought to administer them with liberality in furtherance of justice, but we know of no case, and none has been called to our attention, where a trial court has been reversed for denying leave to amend under similar circumstances to those disclosed by the record in the case at bar. Errors of that class do not constitute reversible error, unless it clearly appears that the court abused its discretion. We are not prepared to say that the court abused its discretion in denying leave

to amend in the instant case. The record discloses that up to the time the application to amend was made Hertzel by his pleadings, at least, and Barnsdall by his pleadings and conduct unqualifiedly repudiated the contract set up by Weber, and each claimed to be the sole owner of the fund. Hertzel refused to pay the $5,000 draft upon the ground that Barnsdall was the sole owner of the property from whence the fund accrued, but, when he answered, he answered jointly with Barnsdall to the effect that he and Barnsdall were the sole owners of the fund. The court below found this and other conduct of the same nature on the part of Hertzel and Barnsdall to be in consummation of a fraudulent scheme on the part of Hertzel and Barnsdall to appropriate the entire fund in derogation of Weber's rights. Their conduct can logically be explained upon that theory, and, as neither of them has attempted to make any other explanation of it, we are disposed to let the finding of the court below stand. Barnsdall, even while asking leave to participate in one-third of the fund, contended that he was entitled to it all, a position entirely inconsistent with participation under the Weber contract. Moreover, the record discloses that, while the court refused Barnsdall and Hertzel leave to file amended pleadings, it allowed all parties in the cause the right to file amended pleadings to conform to the proof, and that the evidence adduced was not strictly confined to the issues joined by the pleadings, but all the parties were given an opportunity to testify fully in regard to their respective claims. The following from the findings of the court indicates that the court took a broad view of the entire controversy, and considered all the proof offered by the parties:

"The court is of the opinion, and so holds, that Hon. H. H. Montgomery was appointed by the court, and by consent stipulated in writing by all parties hereto, and commissioned by the court to take and report all the proofs of such parties in support of their respective contentions in this case, and for such purpose he was in all respects an officer of the court, and that having fully discharged all his duties in the premises without objection, and having accorded full opportunity to all the parties to take and make their proof and the parties having done so, and having treated such evidence so made and taken, with

all the papers in the case, the court, in the absence of fraud, accident, mistake, or any legal reason, will hold the parties to their agreement, and that the only duty now upon this court is to hear the parties and then find the facts from such proof, and apply the law thereon as in all conscience of a court of equity dictates."

The next assignment of error is based upon the theory that the evidence taken before the commissioner should have been treated as depositions, and that the court ignored section 5885, Comp. Laws 1909, which provides:

"The court shall on motion of either party hear and decide the questions arising on exceptions to depositions, before the commencement of the trial."

Upon the questions of exceptions, we find the following among the findings of the court:

"The court has fully and carefully considered all the objections of the defendants, Theodore N. Barnsdall and F. E. Hertzel, to the proofs of the said defendant, Weber, in the cause as made by them or either of them before the commissioner and in this court, and in so far as they are inconsistent with the conclusion of law by this court in the premises, they are disallowed and overruled."

We think that was sufficient. Treating the evidence admitted as depositions, it has been held that "exceptions to depositions for incompetency and irrelevancy should be heard and decided usually during the progress of the trial. The court can properly refuse to hear them before the trial commences." (*Tays v. Carr,* 37 Kan. 141, 14 Pac. 456.)

The next two assignments involve the action of the court in refusing to permit Barnsdall and Hertzel to testify after the case was closed before the commissioner. All of the witnesses seem to have had ample opportunity to testify before the parties voluntarily closed their case. On this ground alone the court was justified in refusing to reopen it, but additional grounds might be assigned for refusing to permit Mr. Barnsdall to testify in view of his statement in relation to his real claim and the one he finally concluded to stand upon. He could not with any degree of consistency support the allegations of

his amended answer while persistently insisting that in his opinion he was entitled to the entire fund.

The mode of trial adopted by the parties to the cause is not one of the modes prescribed by the statute for the trial of a civil action. We are of the opinion, however, that waiving the equitable character of this suit, which was pending when the state was admitted, the manner of taking evidence is a proper subject for stipulation between the parties, and that, in order to warrant the interference of the court to relieve any of them from its effect, there must be a showing of fraud, collusion, mistake, or surprise to the prejudice of the losing side. 36 Cyc. 1295.

"Any matter which involves the individual rights of the parties to a cause may properly be made the subject of a stipulation between them. They may by stipulation waive the benefit of a statutory or constitutional provision or rule of law, or irregularities, and they may agree upon the existence or truth of certain facts." (36 Cyc. 1285.)

The record disclosed that neither Hertzel nor Barnsdall ever objected to the power of Montgomery to act as commissioner to take and report all the proof in the cause, and that neither of them sought to abrogate the stipulation or the order of court entered pursuant thereto in any particular. Upon that point the court below found as follows:

"Pursuant to the consent stipulation of the parties and order of court thereon, H. H. Montgomery, a reputable member of this court in good standing, was appointed a commissioner to take proof in this case. It was clearly the intent and agreement of the parties, and so understood by the court making the order, that Mr. Montgomery was appointed a commissioner, not to take the proofs merely by way of formal depositions in the ordinary run of practice, and in all particulars as required by statute, but to take and report all the proofs of the parties in the cause for submission to this court, sitting in equity, without trial by jury, whose duty it was to find the material and credible facts and apply the law thereto. It was not only proper for the parties to make a stipulation of this kind, and by an agreement fully consummate its purpose, but in equity cases the court will, for obvious reasons, be warranted in recognizing such practice. No rule of law or principle of public

policy forbids it.  Mr. Montgomery at the time of his appointment was, as suggested, a reputable member of the bar in good standing, and he was therefore an officer of this court, and his standing and character afforded the parties more time and advantageous means to make their proofs in full before him than in the ordinary trial in open court before a chancellor.

We think the foregoing excerpt from the findings of the court below states the rule correctly.  It is not necessary to discuss in detail the remaining assignments.  We have reviewed the rulings of the court below on the evidence rejected and admitted of which counsel complain, and find no error justifying a reversal on that ground.

As the next assignment is disposed of adversely to the plaintiffs in error by the conclusion reached in that part of this opinion pertaining to assignments numbers 6 and 7, it follows that the judgment of the court below must be affirmed.  It is so ordered.

All the Justices concur.